IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PEORIA TAZEWELL PATHOLOGY GROUP, S.C.; CONSULTANTS IN LABORATORY MEDICINE AND PATHOLOGY, LTD.; CONSULTANTS IN CLINICAL PATHOLOGY, LTD.; R GLENN HESSEL, M.D.; RONALD CHAMPAGNE, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> JACK MESSMORE, ACTING DIRECTOR OF THE STATE OF ILLINOIS DEPARTMENT OF INSURANCE, in His Official Capacity; ILLINOIS DEPARTMENT OF INSURANCE; LISA MADIGAN, ATTORNEY GENERAL OF THE STATE OF ILLINOIS, in Her Official Capacity; STATE OF ILLINOIS c/o LISA MADIGAN, ATTORNEY GENERAL OF THE STATE OF ILLINOIS, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) CASE NO. 11 cv 04317 ) ) ) JUDGE  John W. Darrah ) ) ) ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

{2834671:2}

Plaintiffs, by and through their counsel, McDonald Hopkins LLC, hereby offer their Reply Memorandum in Support of their Motion for Preliminary Injunction against Defendants.

## I. INTRODUCTION

Plaintiffs seek relief from the implementation and enforcement of an Illinois Statute that arbitrarily, unfairly and irrationally deprives Plaintiffs of their constitutional rights. Public Act 96-1523, now codified at 215 ILCS 5/356z (the "Act"), on its face, shifts from insurers to certain physicians the financial and administrative burden of payment for medical services received by insured patients from those enumerated in-facility specialty physicians who are not in their insurer's networks. Neither before nor after the Act's effective date was this burden actually borne by patients. The Act applies only to physicians who practice in certain arbitrarily-selected specialties, essentially conscripting them into public service, in that they are required to provide professional services without assurance of either just compensation or recourse to the courts.

Plaintiffs have demonstrated a likelihood of success on multiple claims directed at the Act's unconstitutionality, even though they need only prove some likelihood of success on one of their claims to prevail on this Motion and in their suit. Plaintiffs also have demonstrated that implementation and enforcement of the Act will cause Plaintiffs irreparable harm for which there is no adequate remedy at law. Defendants offer little argument to the contrary, and none that has merit. This Court therefore should enjoin Defendants from enforcing the Act pending the Court's ultimate determination regarding the Act's constitutionality.

## II. DEFENDANTS' UNRESPONSIVE MOTION

Plaintiffs have moved this Court for a preliminary injunction, and requested expedited briefing and oral argument on their motion. (Docket Nos. 5, 7). Following Defendants' declaration that they must give "careful consideration and analysis" to the "important and

complex" legal issues raised in the Motion for Preliminary Injunction, the Court provided Defendants with extended time and forty-one pages in which to respond to Plaintiffs' Motion. (*See* Defendants' Response to Motion to Expedite Briefing and Oral Argument, Docket No. 17, at 2; *see also* Docket No. 25). Rather than respond to Plaintiffs' Motion, however, Defendants filed an untimely[1] Motion to Dismiss. (Docket No. 28). Defendants filed a twenty-four page memorandum of law labeled as both supporting their Motion to Dismiss and opposing Plaintiffs' Motion for Preliminary Injunction ("Defs' Mem."). (Docket No. 29). Defendants devote only one of their twenty-four pages to directly addressing Plaintiffs' Motion; Defendants' other 23 pages do not provide a reasoned opposition to Plaintiffs' Motion. Because Plaintiffs' Motion for Preliminary Injunction is not substantively opposed, it should be granted.

### III. LAW AND ARGUMENT

In their filings, Plaintiffs have demonstrated that they have satisfied the threshold elements for injunctive relief: (1) their case has some likelihood of succeeding on the merits; (2) there exists no adequate remedy at law; and (3) they will suffer irreparable harm if preliminary injunctive relief is denied. *See Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992). Because Plaintiffs have met this burden, the Court must consider any irreparable harm that Defendants might suffer if preliminary relief were granted, and balance such harm against the irreparable harm Plaintiffs will suffer if relief were denied. *See Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir. 1994). The Court must consider any public interest that would be affected by granting or denying the requested relief and weigh all of these factors, "sitting as would a chancellor in equity." *Abbott*, 971 F.2d at 12. Plaintiffs here are entitled to injunctive

---

[1] Defendants were served with the Summons and Complaint on June 27, 2011 and had 21 days to move or otherwise plead to the Complaint. *See* Fed. R. Civ. P. 12(a)(1)(A)(i). Defendants' Motion to Dismiss was filed 29 days later.

{2834671:2}

relief because they have demonstrated that they will suffer irreparable harm as a result of the constitutional violations alleged, and they are likely to prevail on the merits of those claims.

      A.    **Defendants Offer No Substantive Rebuttal To Plaintiff's Demonstration of Irreparable Harm For Which There Is No Adequate Remedy at Law In The Absence Of Injunctive Relief.**

Plaintiffs have set forth in detail the irreparable harm that will result from implementation of the Act. (See Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Pls' Mem."), Docket No. 6, Exhibit 1, at 34-37). The Seventh Circuit has stated that there is no adequate remedy at law if the plaintiff "will suffer . . . harm that cannot be prevented or fully rectified by final judgment after trial . . . ." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). The lack of an adequate remedy at law and irreparable harm form two sides of the same analysis. *See Abbott Labs.*, 971 F.2d at 11. Some evidence of a constitutional violation suffices to establish irreparable injury as a matter of law. *See David K. v. Lane*, 839 F. 2d 1265, 1268 (7th Cir. 1988); *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (concluding no further showing of irreparable harm necessary when an alleged deprivation of constitutional rights is at issue); *Walters v. Thompson*, 615 F.Supp. 330, 341 (N.D. Ill. 1985).

Defendants' position on irreparable harm is embodied in two conclusory sentences, stating that "[t]he arbitration process is a remedy at law . . ." and "the new procedures, including arbitration, have yet to be put into place." (Defs' Mem. at 23). Defendants' response misses the mark. The adequate remedy issue, for purposes of satisfying the preliminary injunction standard, is *not* whether Plaintiffs have some sort of recourse under the Act for non-payment or under-payment by insurers. Rather, the issue is whether Plaintiffs have an adequate remedy at law for the enumerated violations of their constitutional rights during the pendency of this action.

Plaintiffs have described that the Act so infringes on Plaintiffs' constitutional right to freely contract – and choose not to contract – with other entities, as to render any money damages that Plaintiffs could recover inadequate as a remedy. Moreover, the Act denies Plaintiffs equal protection, due process, and access to the courts so as to render damages (even if damages were recoverable against the state, which in some instances they might not be) inadequate as a remedy. Plaintiffs therefore have established this element favoring the granting of injunctive relief.

### B. The Balance of Harms Favors The Granting Of Injunctive Relief to Plaintiffs Because Defendants Neither Claim That They Will Suffer Irreparable Harm Nor Establish That The Public Interest Will Be Harmed By Injunctive Relief.

Because Plaintiffs can demonstrate both a likelihood of success on the merits and that irreparable harm would result if injunctive relief were not granted, Defendants must identify irreparable harm that they would suffer if injunctive relief were granted. *Storck,* 14 F.3d at 314. Defendants do not even allege that they would suffer irreparable harm if implementation of the Act were delayed pending the Court's consideration of the merits of Plaintiffs' constitutional arguments. In fact, they will not. Delay in the implementation of the Act will not harm – much less irreparably harm – Defendants.

The Court further must consider any harm that the public would suffer if injunctive relief were granted. Defendants offer only the cursory statement that "there would be a harm to the public interest if this reasonable statute to control healthcare costs were put on hold for an indefinite period." (Defs' Mem. at 24). Defendants fail to explain how this Act is "reasonable," much less how it "control[s] healthcare costs." (*Id.*). The Act shifts the burdens associated with payment for patients' out-of-network medical services from insurers to an arbitrarily-selected group of physicians. The Act has no impact on patients or on the public as a whole, and provides

no benefit whatsoever to financially vulnerable uninsured patients. (*See* Pls' Mem. at 10-11).[2] The Act benefits only insurers, not the public; Defendants present no evidence to the contrary. Where, as here, there is no change to the burdens on the public from a return to the *status quo ante*, the requested preliminary injunction should be granted. (*See* Pls' Mem. at 38-39).

>   C.  **Plaintiffs Have Established The Requisite Likelihood Of Success on the Merits By Presenting Some Evidence From Which The Court Can Conclude That Enforcement of the Act Violates Plaintiffs' Constitutional Rights.**

In response to the preliminary injunction motion, Defendants have focused their arguments on the likelihood of success on the merits of Plaintiffs' federal claims. To meet their burden on this element, Plaintiffs need only show that they have "a ***better than negligible chance of success*** on the merits of ***at least one of [their] claims***." *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (emphasis added and internal quotations omitted). Defendants cite *Girl Scouts*, and acknowledge that its standard, which the Seventh Circuit has characterized as an "admittedly low requirement," applies here. *Id.* (Defs' Mem. at 23). In their filings, Plaintiffs have established some likelihood of success on the merits of not one, but multiple claims. Defendants' unsupported conclusory arguments to the contrary are insufficient to defeat Plaintiffs' Motion for Preliminary Injunction.

To prevail on their claim under Section 1983, Plaintiffs must prove that Defendants: (1) acted under color of state law; to (2) deprive them of rights, privileges, or immunities guaranteed by the Constitution or laws of the United States. *Bayview-Lofberg's, Inc. v. City of Milwaukee*, 905 F.2d 142, 144 (7th Cir. 1990). The requisite state action having been inarguably established by the enactment and enforcement of the Act, Defendants contend only that the Act effects no constitutional deprivation. In fact, Plaintiffs' constitutional rights – including their

---

[2] In fact, enforcement of the Act may ultimately result in harm to the public, in that physicians in the enumerated specialties will choose not to contract with hospitals or provide in-facility care, or will choose to relocate outside of Illinois, in which cases the quantity and quality of care available to the public will suffer.

rights to the equal protection and due process of the laws and freedom to contract – are abridged by the implementation and enforcement of the Act. Plaintiffs have made a strong enough showing at this early stage of litigation demonstrating that the Act violates at least one constitutional provision to establish a likelihood of success on the merits. Defendants' sole argument against injunctive relief therefore fails and preliminary injunctive relief should be granted to Plaintiffs.

>    *1.     Plaintiffs Have Established a Likelihood of Success On Equal Protection Grounds As Defendants Have Made No Showing That The Act's Distinction Among Specialty Physicians Is Rational.*

Plaintiffs have demonstrated a likelihood of success on the merits of their equal protection challenge because the Act irrationally singles out physicians in certain arbitrarily-selected specialty areas for disadvantageous treatment. Defendants acknowledge that even economic regulation cannot withstand an equal protection challenge if it is "wholly arbitrary." (Defs' Mem. at 8, *citing City of New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976)). In short, the Equal Protection Clause is offended if the Act's classification "rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961); *Kotch v. Bd. of River Port Pilot Comm'rs*, 330 U.S. 552, 556 (1947).

Classification of practitioners in a particular field and determinations regarding their compensation on the basis of factors not specifically related thereto has been held to constitute an equal protection violation. Thus, in *Family Division of Trial Lawyers of Superior Court - D.C., Inc. v. Moultrie*, 725 F. 2d 695, 710 (D.C. Cir. 1984), the court overturned the summary judgment that had denied the equal protection claim of family law practitioners who asserted that members of their specialty practice who had signed up for appointment as compensated public defenders in juvenile cases were, without a rational basis, singled out from others to bear a

disproportionate burden of *pro bono* appointments to represent indigent parents in family court. Similarly, in *Merrifield v. Lockyer*, 547 F. 3d 978, 991 (9th Cir. 2008), the court struck down on equal protection grounds a statute distinguishing for licensing purposes among pest control professionals based upon the type of vertebrate animals they removed, with no rational basis for doing so other than economic reasons. *Id.* Like the defendants in *Moultrie* and *Merrifield*, Defendants here have failed to show that the Act's arbitrary selection of medical specialty practices for additional regulation rationally relates to any of the Act's claimed purposes.

Defendants cannot show any relationship between the Act's arbitrary classification and its purpose. So Defendants instead argue that the Act, when afforded great deference, may relate to a purpose of eliminating surprise bills to the patient "who has done everything right." (Defs' Memo at 4). This argument, in addition to its internal flaws, does not negate Plaintiffs' demonstration that the Act's distinction among physician specialties is irrational.

By its express terms, the Act applies to facility-based physicians who practice only certain medical specialties. (*See* 215 ILCS 5/356z.3a(a)). Specifically, the Act applies to physicians practicing radiology, anesthesiology, pathology, neonatology and emergency medicine. (*Id.*). Within a given facility, the Act thus distinguishes between physicians practicing the enumerated specialties and those practicing specialties not so enumerated. For example, an out-of-network consulting neurosurgeon providing services in the same facility at the same time and under the same circumstances as an out-of-network pathologist would not be affected at all, let alone unfairly burdened by the Act. Indeed, a patient may have "done everything right" with respect to receiving treatment from *all* out-of-network physicians – and in fact the patient will be balance-billed by *none* of them, under law pre-dating the Act. But these identically-situated physicians nonetheless have vastly different rights and responsibilities by

virtue of the Act with respect to payment for services rendered pursuant to their hospital contracts.

Defendants offer no rational basis for the Act's discrimination, and no evidence from which one could conclude that the enumerated specialties are appropriately singled out. To the contrary, Defendants have inadvertently highlighted the murkiness of the Act's classification of physicians in their reference to supporting language from other documents.[3] Differing from one another, the cited documents also differ from the language of the Act. The inescapable fact that the identification of relevant specialty groups varies in these state-authored documents demonstrates the arbitrary nature of the final enumeration of specialty groups in the Act.

Moreover, the unconstitutional classification among physicians is not related – let alone rationally related – to the statutory purpose Defendants now claim for the Act in their brief: to "control healthcare costs." (Defs' Mem. at 24). As shown, the Act does no more than shift the administrative and financial burden of payment for services from insurers to certain arbitrarily-selected specialty physicians in certain instances. (Pls' Mem at 7-9). Moreover, insurers still bear responsibility for out-of-network specialty physicians not enumerated in the Act. (*See* 50 Ill. Admin. Code § 205.310(1)(6)(H) & (I)) (providing that insurers must ensure that insureds receive care from out-of-network physicians in certain circumstances without cost greater than that incurred for an in-network physician). Further, the Act has no impact on costs related to uninsured patients who are unwilling or unable to pay for services. Singling out arbitrarily-selected specialty physicians to bear the Act's burdens bears no relation to the claimed cost-controlling purpose of the Act.

---

[3] The Insurance Code hold-harmless provision Defendants discuss applies to "radiologists, anesthesiologists, pathologists, neonatologists, and emergency room physicians." See 50 Ill. Admin. Code § 205.310(1)(6)(I). Defendants also quote a letter from the Director of the Department of Insurance, which refers to a "radiologist, anesthesiologist, pathologist or similar specialty provider." (emphasis added).

Plaintiffs have made the requisite showing – more than a negligible chance of success – on their claim of having been deprived of their federal equal protection rights. A preliminary injunction should issue.

> 2. ***The Act's Implementation and Enforcement Deprives Plaintiffs of the Liberty Interest Guaranteed Them by the Fourteenth Amendment to the United States Constitution.***

Plaintiffs have provided sufficient factual evidence from which the Court can conclude that they have a likelihood of success on the merits of their due process claims. As Defendants admit, Plaintiffs are constitutionally guaranteed freedom to engage in their chosen profession. (Defs' Mem. at 11).[4] Moreover, despite Defendants' assertions to the contrary, courts have held that a due process claim is available under circumstances other than a complete ban on one's ability to practice a profession.

For example, the *Moultrie* case, 725 F.2d at 706, is instructive on this issue, finding an unconstitutional taking. The *Moultrie* Court observed that an unconstitutional deprivation of rights can result from an unreasonable system that effectively denies a plaintiff the right to remunerative practice in the zone of his choice. *Id.* at 706; *see also Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (due process applies to bar licensing, since that is state's grant of permission to engage in the occupation of practicing law). Even though the lawyers in *Moultrie* could conceivably have chosen not to practice in the court with unfair assignment procedures, or not to seek appointment to public defender cases, the court found an unconstitutional taking had occurred. *Moultrie*, 725 F. 2d at 707.

---

[4] Defendants' assertion that Plaintiffs' Verified Complaint included no "occupational liberty" claim is incorrect. Paragraph 41 of the Complaint, for example, expressly states that, "the Statute, as enacted and implemented, violates Plaintiffs' basic rights to earn a living and to pursue the livelihood of their choosing." The Complaint further states that "the Statute violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution."

Here, the Act significantly impairs the abilities of arbitrarily-selected specialty physicians such as Plaintiffs to secure just compensation for services they are contractually and statutorily obligated to provide. Plaintiffs are perhaps worse off than the *Moultrie* plaintiffs, because the *Moultrie* plaintiffs were dealing with a public entity struggling to ensure legal services for indigent litigants, whereas Plaintiffs are forced by the Act to negotiate their compensation with a private party, contractually unrelated to Plaintiffs, whose own profit motive requires it to minimize the amount paid to physicians like Plaintiffs. (*See* Pls' Mem. at 10-11).

Plaintiffs' "recourse" under the Act is an arbitration framework that is both impractical and unrealistic. Plaintiffs and others similarly situated cannot reasonably arbitrate a $100.00 claim, as the cost of arbitration far exceeds the amount sought to be recovered. (Pls' Mem. at 36-37). Because Plaintiffs will generate hundreds, if not thousands, of claims each day, a substantial majority of which are for relatively small amounts, the effect of the insurers' inevitable underpayments and the corresponding expensive and time-consuming arbitration process – one arbitration per claim – on Plaintiffs' livelihood is crippling. These facts support a finding that Plaintiffs are likely to prevail on their due process claims.

### 3. The Act Violates Plaintiffs' Constitutional Freedom To Contract By Effectively Conscripting Them To Provide Professional Services With No Guarantee of Just Compensation.

Plaintiffs are likely to prevail on their claim that the Act unfairly abridges Plaintiffs' constitutional rights to contract – and not contract – as they see fit. Defendants themselves cite cases confirming the basic principle that "private contracts are not subject to unlimited modification under the police power." *United States Trust Company of New York v. New Jersey*, 431 U.S. 1, 22 (1977) (cited in Defs' Mem. at 13); *see also Association of Surrogates and*

*Supreme Court Reporters within The City of New York v. New York*, 940 F. 2d 766, 773 (2d Cir. 1991) (cited in Defs' Mem. at 14).

Courts considering claims under the Contracts Clause apply a sliding scale of review. *Chicago Bd. of Realtors, Inc. v. Chicago*, 819 F. 2d 732, 737 (7th Cir. 1987). Where the impairment is "substantial" and not "minimal," "it can survive scrutiny only if it is 'reasonable and necessary to serve an important public purpose.'" *Association of Surrogates*, 940 F. 2d at 772, *quoting United States Trust Co.*, 431 U.S. at 25. Plaintiffs have demonstrated a likelihood of succeeding on their contract clause claim because Defendants cannot establish that the severe impairment effected by the Act is necessary to further a legitimate state purpose.

As Plaintiffs have shown, the Act effectively nullifies their existing hospital contracts and requires Plaintiffs to work with payors with whom they already have chosen not to contract. (*See* Pls' Mem. at 28-29, 35-37).[5] The nullification of one contract and the effective creation of another represents a substantial impairment of Plaintiffs' contract rights. Defendants appear to concede that some contractual impairment exists by proceeding to explain away any impairment as "justified" under the circumstances. (*See* Defs' Mem. at 15-18).

Defendants contend that when a patient is immune from balance billing, the insurer and the physician have incentives to negotiate billing rates. (Defs' Mem. at 15). But Defendants fail to address the crux of Plaintiffs' contractual impairment argument: that Plaintiffs and physicians like them already have contracted with hospitals to provide services and receive payment based on the essential predicate that the patient is *not* immune from balance billing. (Defs' Mem. at 15). Plaintiffs contracted on this basis and now, by intervening action of law, must render

---

[5] Defendants' counter-argument actually highlights yet another infringement on Plaintiffs' contract rights. Defendants note that courts have held that there exists between patient and physician an implied contract that the patient will pay the physician the "usual and customary" rates for services. (Defendants' Memorandum at p. 16). Here, however, Plaintiffs have already provided services to patients from whom the Act prohibits them from seeking a usual and customary – or indeed any – fee.

services as required under these contracts without the bargained-for benefits, which included the ability to seek compensation from patients for these services.

The effect of the Act is to *remove* all incentive from the insurer to negotiate. Under the Act, insurers are directed to "negotiate," but ultimately may pay or not pay at whatever rate they see fit. The Act deprives Plaintiffs and physicians like them of any meaningful recourse in the event that the insurer underpays. (*See, supra*, at 11). Plaintiffs cannot refuse to provide service as a negotiating strategy to increase the fairness of their compensation because of their existing statutory and contractual obligations. Defendants fail to address any of these issues, instead stating with no support whatever that each party will continue to have incentives to negotiate to maximize the benefits each receives and that "it is highly likely some middle ground will be reached." (Defs' Mem. at 16). Defendants cite no basis – and there is none – for this statement. The Act infringes substantially and severely on Plaintiffs' existing contracts.

Because the impairment at issue is "substantial," it can survive constitutional scrutiny only if it is "reasonable and necessary to serve an important public purpose." *United States Trust Co.*, 431 U.S. at 25. Defendants claim that the Act creates "incentives for negotiation and dispute resolution." (Defs' Mem. at 18). Neither Defendants nor the Act itself identifies any such incentive. Indeed, as demonstrated above, the Act *removes* incentives for the insurer to negotiate with Plaintiffs. Plaintiffs must render services, and their only prospect for payment is from an insurer that knows such physicians are unable, as a practical matter, to dispute the payment amount decreed by the insurer. It is difficult to see any connection between the Act and any legitimate state goal, let alone the necessity of the Act to achieve such a goal.

The severity of the impairment to Plaintiffs, coupled with the utter lack of any relationship to a legitimate purpose to protect the state welfare, renders the Act an

unconstitutional violation of the Contracts Clause, U.S. Const. Art. I, § 10. On this basis, Plaintiffs have established a likelihood of success on the merits sufficient to support imposition of a preliminary injunction.

### 4. *The Act Is Void On Its Face Because The Provisions Of The Act Do Not Provide An Understandable Standard For Enforcement.*

Plaintiffs have established a likelihood of prevailing on their claim that the Act is unconstitutionally vague. (Pls' Mem. at 22-24). The Act, in effect, provides insurers unilateral and unfettered control to determine payment amounts. Moreover, the Act subjects Plaintiffs to binding arbitration, without reference to court review and without setting any standard by which the arbitrators will decide the issues.

Despite Defendants' statements to the contrary, the effect of the Act is to give insurers unfettered control over rates. There is no guarantee that any negotiation will be in good faith because there is no incentive for insurers to so negotiate. Plaintiffs and physicians like them cannot practicably arbitrate, one by one, a vast number of relatively small claims in which they are underpaid. Because of the upper hand awarded to insurers which, in effect, allows them to pay out-of-network physicians even less than in-network physicians, there likewise is no incentive for insurers to negotiate future contracts with *any* physician at fair rates.

Defendants claim that the ambiguity surrounding the Act's arbitration mandate is eliminated by the existence of American Arbitration Association ("AAA") rules and procedures, but the Act does *not* adopt or incorporate by reference rules, procedures or any other provisions of the AAA. The Act merely states that all arbitrators shall be trained by the AAA or by the American Health Lawyers Association ("AHLA"). (215 ILCS 5/356z.3a(e)). The Act does not require arbitrators to adhere to AAA – or any other – standards when adjudicating disputes arising out of the Act. The extraordinary fact that the state has responded to Plaintiffs' genuine

concerns with the non-answer that the "American Arbitration Association has rules and procedures about the conduct of arbitration," when such rules are not incorporated into or even referenced by the Act, illustrates the Act's complete failure to provide a workable remedy. (*See* Defs' Mem. at 20).

Defendants vacillate as to the standards that might apply, stating in one instance that fees must, by law, be "reasonable and customary," and later stating that the arbitrators will certainly be able to determine whether the bills are "fair and reasonable." (Defs' Mem. at 16, 20). Defendants offer no basis for the application of these or any other standards in the context of this Act. Neither standard appears in the Act.

The arbitration provision's mechanical flaws and lack of standards make it unlikely that cases will be decided with any degree of evenhandedness. Because of these defects, the Act fails to protect against "arbitrary and discriminatory" enforcement of its provisions. *See Karlin v. Foust*, 188 F.3d 446, 459 (7th Cir. 1999) (citing *Grayned,* 408 U.S. 104, 108-09) (1972). The Act is unconstitutionally vague and therefore void.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their Motion for Preliminary Injunction pursuant to Rule 65(a), ordering that the State shall not implement and/or enforce Public Act 096-1523, amending 215 ILCS 5/356z.3 and adding 215 ILCS 5/356z.3a.

    Respectfully submitted,

    Peoria Tazewell Pathology Group, S.C., Consultants in Laboratory Medicine and Pathology, Ltd., Consultants in Clinical Pathology, Ltd., R. Glenn Hessel, M.D. and Ronald Champagne, M.D.

    By:   _s/Anne Owings Ford_____
          One of its Attorneys

- 15 -

**ATTORNEYS FOR PLAINTIFFS**
**McDONALD HOPKINS LLC**
RICHARD N. KESSLER (6183140)
JOSEPH J. JACOBI (6273967)
300 N. LaSalle Street, Suite 2100
Chicago, Illinois 60654
Tel: (312) 280-0111
Fax: (312) 280-8236
Email: rkessler@mcdonaldhopkins.com
jjacobi@mcdonaldhopkins.com

**McDONALD HOPKINS LLC**
ANNE OWINGS FORD (OH 0043717) (appearing *pro hac vice*)
600 Superior Ave., East, Suite 2100
Cleveland, OH 44114
Tel: (216) 348-5400
Fax: (216) 348-5474 (facsimile)
Email: aoford@mcdonaldhopkins.com

Dated: August 10, 2011

## **CERTIFICATE OF SERVICE**

      I, Anne Owings Ford, an attorney, hereby certify that on August 10, 2011, I electronically filed Plaintiffs' Reply Memorandum in Support of Their Motion For Preliminary Injunction with the Clerk of the Court using the Electronic Case Filing System and in compliance with the General Order on Electronic Case Filing, Section III(B)(1). As such, these documents were served on all counsel who are deemed to have consented to electronic service. Fed. R. Civ. P. 5(b)(2)(D) and Local Rule 5.9.

                /s/ Anne Owings Ford